733 F.Supp. 1324 (1990)
Craton LIDDELL, et al., Plaintiffs,
v.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al., Defendants.
No. 72-100 C (5).
United States District Court, E.D. Missouri, E.D.
January 12, 1990.
William P. Russell, Joseph McDuffie, St. Louis, Mo., for Liddell plaintiffs.
Michael A. Middleton, Columbia, Mo., William L. Taylor, Washington, D.C., Wayne C. Harvey, Caldwell Harvey Hughes McHugh & Singleton, St. Louis, Mo., for Caldwell/NAACP plaintiffs.
Kenneth C. Brostron, Lashly Baer & Hamel, St. Louis, Mo., for City Bd. defendants.
Michael J. Fields, Bart A. Matanic, Asst. Missouri Attys. Gen., Jefferson City, Mo., John J. Lynch, Asst. Missouri Atty. Gen., St. Louis, Mo., David R. Boyd, Sutherland Asbill & Brennan, Washington, D.C., for State of Mo., defendants.
Andrew J. Minardi, Joseph D. Ferry, St. Louis, Mo., for St. Louis County defendants.
Shulamith Simon, Husch Eppenberger Donohue Cornfeld & Jenkins, St. Louis, Mo., for Court-Appointed amicus curiae.
Craig M. Crenshaw, Jr., Jeremiah Glassman, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for U.S.
James J. Wilson, St. Louis City Counselor, St. Louis, Mo., for City of St. Louis.
Anthony J. Sestric, Sestric & Cipolla, St. Louis, Mo., for St. Louis Collector of Revenue.
Charles Werner, St. Louis, Mo., for Missouri NEA.
Charles R. Oldham, St. Louis, Mo., for St. Louis Teachers Local Union 420.
Henry D. Menghini, Robert J. Krehbiel, Evans & Dixon, St. Louis, Mo., for St. Louis County School Districts  Affton & Lindbergh.
Darold E. Crotzer, Jr., St. Louis, Mo., for Bayless, Jennings, Normandy & Wellston.
Bertram W. Tremayne, Jr., Tremayne Lay Carr Bauer & Nouss, St. Louis, Mo., for Kirkwood & University City.
Frank Susman, Susman Schermer Rimmel & Parker, St. Louis, Mo., for Ferguson-Florissant.
George J. Bude, St. Louis, Mo., for Brentwood, Clayton & Hancock Place.
Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood.
Robert G. McClintock, St. Louis, Mo., for Ladue.
Richard H. Ulrich, Summers Compton Wells & Hamburg, St. Louis, Mo., for Maplewood-Richmond Heights.
John Gianoulakis, Kohn Shands Elbert Gianoulakis & Giljum, St. Louis, Mo., for Mehlville, Pattonville & Ritenour.
Donald J. Stohr, James W. Erwin and R.J. Robertson, Thompson & Mitchell, St. Louis, Mo., for Parkway.
*1325 Edward J. Murphy, Jr., Garry K. Seltzer, St. Louis, Mo., for Riverview Gardens.
Douglas A. Copeland, Robert W. Copeland, Copeland Gertner & Thompson, St. Louis, Mo., for Rockwood & Webster Groves.
Joseph Niemann, Eric Schmitz, Jordan Cherrick, Armstrong Teasdale Schlafly Davis & Dicus, St. Louis, Mo., for St. Louis County Special.
Kenneth V. Byrne, Schlueter & Byrne, St. Louis, Mo., for Valley Park.

ORDER
LIMBAUGH, District Judge.
For over seven long years parents, students, and vocational education staff have endured substandard vocational-education programs while the Court and the parties have struggled with desegregating the present dual-vocational-education system.[1] Schools were closed, staff transferred back and forth among schools, programs eliminated and programs shifted around. Nothing seemed to be working. Enrollments continued to plunge and racial numbers virtually remained unchanged.
Pursuant to the remand of Liddell XI, a hearing was held on the 12(b) Phase III plan with a decision to be made after the hearing on the long range magnet proposal.[2] Subsequently, as part of the comprehensive magnet plan, the Court determined that the most optimal use for O'Fallon, the premier vocational education school in the City, was as the Gateway Magnet, incorporating certain vocational-education programs into a math/science/high technology magnet program. See, L(2090)88.
After this decision was made, the Court turned its attention to the remaining vocational-education schools and the problem of who should administer a comprehensive vocational-education system for metropolitan St. Louis students. For the reasons stated in Order L(2293)89, the Court decided the St. Louis Community College was best qualified to develop and administer a new secondary vocational-education system. The Special School District, the City Board and the State thought otherwise and instead of focusing upon the best interests of the students, chose to protect their own proprietary interests by embarking upon a crusade to sabotage the Community College's efforts to gather information and formulate a vocational-education plan which addressed the students' needs and this Court's concerns. On the eve of a hearing[3] to consider the Community College's plan, the Community College asked to withdraw its participation from this case due to the substantial amount of hostility generated by the parties mentioned. It felt its reputation and goodwill in the St. Louis community were being jeopardized by this negativism.
So now we are back to square one. The remaining parties' positions have not changed. The City Board and the Special School District have filed revised plans with essentially the same promises of change.[4] The Metropolitan Coordinating Committee (MCC) has also filed a Phase IV 12(b) plan, but no one of these plans has been particularly impressive.
The proposals are all self-explanatory as to how the respective parties intend to create a desegregated secondary vocational-education system. On paper, the proposals all look adequate. The problem lies with this Court's profound lack of confidence in either the City Board or the Special School District's ability to manage a secondary vocational-education system which meets the needs of all students and parents, wherever they may reside. Furthermore, neither district has ever (at least not in the *1326 last seven years) shown the slightest interest in renovating an antiquated vocational education system. They have persisted in maintaining programs and equipment totally unsuitable to meet the challenges of 21st century technology.
The City Board wants O'Fallon as the only secondary vocational-education school available to metropolitan St. Louis students, to be designated the AVTS[5] for the City and County. It proposes that all programs be consolidated at O'Fallon and that the State provide funds for renovation. The City Board would be solely responsible for programming and staffing. Start-up and capital costs would be paid by the State; operating costs would be paid through City Board's routine budget sources plus the present amount of local tax revenue the Special School District receives and uses for vocational-education. L(2573)89.
The Special School District wants sole control and authority to staff and program South County Tech, North County Tech and West County Tech (reopened). It will conduct a feasibility study on the issue of a limited city secondary vocational-education site. There will be no city representation in the Special School District administration or school board; however, a grievance procedure will be instituted for complaints by city students and parents. There are promises of reviews of curriculum and instructional materials by the newly appointed Assistant Superintendent of Vocational-Education. Start-up and capital costs would be paid by the State. Operating costs will be reimbursable to the Special School District by the City Board and/or the State based upon a "local tax effort per student" formula for city students at a county site or a city site.
The dilemma the Court finds itself in is due partly to its concern for the welfare of all vocational-education students, especially city students, and partly to its concern for fiscal responsibility. The Court has serious reservations about each districts' commitment and ability to develop and provide programs able to meet sophisticated and specialized industry demands, equip schools with modern machinery, and staff schools with persons qualified to instruct students in an integrated vocational facility.
The City Board is presently faced with numerous administrative and educational problems. It would be impractical to add to the struggles by turning over the entire secondary vocational-education system to the City Board. It is barely able to address the needs of its own students. The present superintendent has suggested he will not attempt to have his contract renewed after it expires in June of 1991. The hostilities among the board members have prevented them from making and carrying out the simplest decision which at times has rendered the Board impotent. The City Board as an entity and its administrators have consistently carried out a policy of community aloofness which has angered a great number of parents, students and teachers. The school system is well known for its historical inability to make curricular and staff improvements. The St. Louis city voters have consistently failed to pass a school bond issue since 1962. At some point, the City Board will have to increase its tax revenue in order to meet the vocational-education needs of its resident students and the additional county students. If school bond issues continue to fail passage, the financial strain on the city school system could be catastrophic. The Court cannot risk the education of county children on the extremely weak financial support of the city voting populace.
However, neither is the Special School District an acceptable candidate. It has had eight superintendents in thirteen years and has only recently replaced its last superintendent. The Special School District's first priority, as it should be, is its special-handicapped students. It is in this area that the District has expertise. It appears, therefore, on occasion the District has been inclined to use vocational-education programs to support special education needs. Since the inception of 12(b), the Special School District has never demonstrated any *1327 desire to improve existing programs, change programs, or modify its curriculum in any way to meet contemporary industry and student needs, except perhaps, its recent appointment of a black Assistant Superintendent for Vocational-Education. Nonetheless, the main focus of the District is on special education, generally for handicapped students and not on vocational education.
What makes the Court's ultimate decision more difficult is that 12(b) involves a relatively small number of students, especially city students (black and white). According to the MCC's latest figures, L(2656)89, there are approximately 2,140 students enrolled in the secondary vocational-education system. Of this total number, there are 416 black city vocational-education students, 107 of which attend county vocational education schools, with the balance of 309 students attending O'Fallon. There are 157 white city vocational education students, 35 of which attend O'Fallon[6] and approximately 122 enrolled in the county vocational-education schools. Thus, only 573 of the 2,140 total vocational education students live in the city and of this number, only 344 attend the city located school at O'Fallon. 380 county students attend O'Fallon and the balance go to North and South in the county.
The City Board wants O'Fallon back as the only secondary vocational-education school. O'Fallon has the building capacity[7] to accommodate all presently enrolled students plus a few hundred more, but no matter what is done, O'Fallon fails to attract a substantial number of county students. No amount of money and wishful thinking will change that fact. The two currently operating county facilities (North and South County Tech) are grossly under-enrolled. Knowing full well that attracting white county students to a city facility will be a very difficult task, the Special School District pays only lip service to the need of a city site for secondary vocational-education. It feels that a vague "vocational presence" in the city is enough. It is not enough. Although their numbers are few, black city vocational-education students are entitled to more than a token city site.
Everyone appears to agree that a single governing entity for secondary vocational-education in metropolitan St. Louis is the best way to administer a stable, integrated vocational educational system. The Court has no quarrel with this contention. In fact, the Court goes on record as believing that the Community College offered the best plan and hope for a quality integrated vocational-education secondary system. Unfortunately, the Community College's efforts (as well as the Court's) were effectively sabotaged by the self-serving interests of the parties. Assuming arguendo, that the Court prefers a single governance structure, but not with either the City Board or Special School District as the governing entity, there really are only a few options left.
The Court could create an entirely new independent school district, encompassing St. Louis city and county. The new school board would be designated as the AVTS provider for St. Louis city and county. This board would have total authority for the operation of the current vocational-education system. The new district would be divided into electorial subdistricts utilizing the current community college district boundaries. The initial board members probably would consist of four independent MCC members and two board members, nominated by the Special School District and the City Board. Eventually these initial board members would be replaced through a subdistrict electoral process. Details of operating the vocational-education system would be worked out between the Court and the new district's board.
A second option would be to expand the powers and scope of the MCC. It would be *1328 given legal authority to control operation of the secondary vocational-education system. This "new" MCC would have authority to contract with other individuals or entities for personnel, facilities, services, etc. It would employ and supervise all instructional personnel and support staff. The independent members would remain and party representatives would be replaced over time through a sub-district electoral process. Details of operating the vocational-education system would be worked out between the Court and this "new" MCC.
Neither of these two options appeals to the Court because of the enormous time it would take to create a new independent vocational-education school district. There would no doubt be never-ending disagreements as to who would serve on the new board, what facilities would be used, how to finance the new district, and how to staff the new district. It would no longer be just debate among the City Board, Special School District and the State, but now would include active input from all the individual county school districts. As is the historical trend in this case, appeals over every issue decided by this Court would further delay the implementation of stable, viable integrated vocational training for students in the St. Louis metropolitan area.
The truth of the matter is that an incredible amount of time and money has been expended in trying to integrate an alternative school system comprised of a relatively small number of students. Frankly, whether or not approximately 2,100 students attend two or three integrated or non-integrated vocational-education schools has little significant impact upon desegregation. The real problem is that these children are not getting a quality solid education in regular academics and vocational training. The theory has always been that integration would bring better education, but that theory simply is not working in vocational-education. It is definitely time for a new theory. Instead of focusing upon integration, this Court is now focusing on better education for it believes that better educational opportunities will bring integration.
Just as regular school students may transfer to city or county schools or magnets under 12(c), there is no reason that vocational-education students, city and county, cannot choose a school for themselves. All students desiring a vocational education should be able to obtain it. Under the present system, racial quotas and non-duplicative programming (i.e. a program offered at one site only) has only served to inhibit students from choosing a vocational education. More often than not, a potential vocational-education student will either stay in the home district or drop out of school altogether rather than attend classes in a school not to his or her liking.
What the Court proposes is a restructured vocational-education system based upon choice and competition. A shift in strategy is necessary to foster school improvement and student learning. In order for changes to be effective and long-lasting, they must spring from a district's own desire to respond to new challenges. Up to now, neither the City Board nor the Special School District has felt any real need to implement new or creative ways to meet the needs of vocational-education students. Choice and competition are the incentives this Court believes will spur educational excellence.
The Special School District and the City Board are each going to be responsible for the operation of a secondary vocational-education school. Just as the county districts "compete" for transfer students under 12(c), the Special School District and City Board will "compete" for vocational-education students. Each of these parties will have complete control over programming and staffing. Simply stated, the Special School District and City Board now have the chance to put into action the promises they have made on paper.
The Court has not arbitrarily jumped on the "school by choice" bandwagon. Choice is not a foreign concept to the St. Louis case. This concept is central to implementation of the 12(c) Plan. It is now being applied to the 12(b) Plan. However, just as *1329 the 12(c) Plan has certain conditions attached, so does the 12(b) choice plan.
It is hoped that choice under the 12(b) plan will encourage increased innovation in educational programming, better responsiveness by school administrators, better student and teacher performance, and increased commitment by students and parents. Choice is a strategy that will force reform within the present vocational-education system. Competition makes for better accountability. Choice empowers parents and students to control their own educational destiny and in so doing creates incentives for schools and/or districts to attract students and sanctions for failing to retain them.
The 12(b) choice plan will be a controlled-choice plan. To insure that all vocational-education students have access to schools of acceptable quality, special provisions to protect racial balance will be put in place.
The Special School District will retain ownership and control of North County Tech and South County Tech. It will equip, staff and implement programs in these schools as it sees fit to meet national, community and individual educational needs. These schools will attain and maintain a racial balance of 50% black/50% white with an allowable variance of ± 5%. The Special School District will institute a faculty plan similar to the one contained in the 12(c) Settlement Agreement.
The City Board will renovate Southwest as a secondary vocational-education facility. The renovation costs of Southwest will be divided equally between the State and the City Board. Representatives of the State, City Board and MCC will jointly tour and consider the work necessary to renovate Southwest. Although Southwest shall be a modern facility capable of meeting the present and future needs of vocational-education students, the Court strongly advises the State and City Board to be realistic regarding cost. In order to insure objectivity, the MCC will monitor the renovation work and costs. The City Board will equip, staff and implement programs at Southwest as it sees fit to meet national, community and individual education needs. Southwest will attain and maintain racial balance of 60% black/40% white with an allowable variance of ± 5%. The City Board shall also implement a faculty plan similar to the one contained in the 12(c) Settlement Agreement.
The MCC's present membership structure will remain the same; however, its duties will change. The MCC will act in the same capacity for 12(b) as VICC does for 12(c). The MCC shall supervise recruitment, counseling and placement of vocational-education students; coordinate dissemination of information on available programs to the community; assist in developing and implementing an effective and safe transportation system; develop and implement student grievance procedures; assist in staff development and in-service training activities in order to prepare and continually assist staff to function in integrated settings; and generally perform such other monitoring activities as are necessary to effectively implement 12(b). Although placement of instructive and non-instructive staff will be the responsibility of the respective districts, the MCC shall develop and implement a teacher exchange program. Furthermore, the MCC shall report annually to the parties and the Court progress being made in implementing 12(b). This report shall include information including, but not limited to, student transfers; teacher exchanges; recruitment; counseling and placement efforts; student placement and modifications and disciplinary actions regarding transfer students. The MCC shall develop procedures necessary to gather relevant data, evaluate implementation process, and identify problem areas to be targeted for special intervention or additional revenues.
The Special School District and the City Board will retain their individual authority for the local tax presently collected for vocational programming. Each district is responsible for its own vocational-education operating and capital budget. The MCC shall prepare an annual budget for its operation for approval by the parties and the Court as it has always done in the past. *1330 The State will be responsible for 100% of transportation costs for transfer students.
The Special School District and the City Board will each prepare a staffing plan for certified teaching personnel, administrative and support staff personnel, and non-certified staff personnel. However, these staffing plans will not be implemented until such time as Southwest High School is renovated and operational as a vocational-education school. Meanwhile, all vocational education employees currently assigned will remain in their respective positions. Employees directly displaced by the relocation of programs from O'Fallon shall have the option of either being placed on the seniority lists of Special School District or the City Board for purposes of employment. Former employees of the City Board who are employed by the Special School District shall be subject to the policies and regulations of the Special School District; however, such persons shall not suffer a reduction in salary or seniority upon initial reassignment, but the Special School District may, with court approval, devise a system by which former City Board employees and their Special School District counterparts eventually achieve salary parity. Former employees of the City Board hired by the Special School District may elect to remain in the City Board's retirement system or join the Missouri State Teacher's Retirement System. The Special School District shall make the required contributions according to the former City Board employee's elected retirement system.
Equipment and support material at O'Fallon not required for the programs remaining as part of the Gateway Magnet will be relocated to Southwest at cost to the State. This equipment will be owned by the City Board. Other than the initial relocation of some equipment to Southwest, the City Board and Special School District shall bear all costs to equip their schools.
As stated before the MCC will remain intact albeit responsible now for providing monitoring activities for the Court. The need for the Bi-Racial Monitoring Team (BRMT) and Vocational Education Advisory Council (VEAC) no longer exists and these two entities will be eliminated.
What the Court has just outlined is its basic requirements for a change in the operation of the 12(b) plan. The Court realizes that there will be at least an interim period of instability until Southwest is operational as a secondary vocational-education school. However, the Court believes that in the long run, its decision will facilitate a quality integrated vocational education for all St. Louis children who desire one.
The ultimate success of 12(b) as always remains hinged on the cooperation of the parties. Vocational education has suffered greatly due in large part to the selfish interests of the parties. Equipment and buildings became more important than the educational needs of the students involved. The Court has chosen this direction because of the adamant cries of the City Board and the Special School District to retain control of vocational-education. This is not the direction the Court would have liked to have pursued, but is willing to give it a try as long as the parties cooperate. In the alternative, the Court will not hesitate to merge the two vocational education systems into one system managed by a newly created (and court-appointed) school board if the parties persist in resisting the implementation of court orders.
The Court concedes that this new 12(b) plan is rough and requires some fine tuning, especially with regard to an interim period before the Special School District and the City Board can operate their respective vocational education schools autonomously. Therefore, the Court will meet with counsel for the City Board, Special School District, State of Missouri, teachers' unions, plaintiffs, United States, Dr. Beacham and any other party in the case desiring to attend on Wednesday, January 24, 1990 at 5:00 p.m. in chambers to discuss only the implementation of 12(b) as outlined in this order.
NOTES
[1] For a general history of the vocational-education dispute, see Liddell V, 677 F.2d 626 (8th Cir.1982) and Liddell XI, 822 F.2d 1446 (8th Cir.1987).
[2] A hearing on vocational-education issues was held before the Court on November 2, 1987 through November 6, 1987 and November 9, 1987 through November 10, 1987.
[3] A hearing on the Community College's plan had been scheduled for June 5, 1989.
[4] See the docket sheets for a complete listing of all vocational-education proposals and responses thereto from 1987-1989.
[5] Area Vocational Technical School.
[6] The breakdown of black students and white students, city and county, are approximate figures. Transfer students who also attend vocational-education classes are considered applicants from the transferee district, i.e. a black city student attending a Parkway school and a vocational-education school is listed as a Parkway applicant by the MCC.
[7] See court order L(1269)87.